IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KELLIE L. WOLFENBARGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10-CV-354-PJC |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Claimant, Kellie L. Wolfenbarger ("Wolfenbarger"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for disability benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Wolfenbarger appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Wolfenbarger was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

### Claimant's Background

At the time of the hearing before the ALJ on February 4, 2008, Wolfenbarger was 45 years old. (R. 34). Wolfenbarger had a high school education. *Id*. Wolfenbarger testified that she was unable to work because she had "too much pain" in her back, stomach, and liver. (R. 35-

36, 42). She also said she had problems working due to panic and anxiety disorders, depression, seizures, nausea, fatigue, knee problems, and vision problems. (R. 35-40, 41-44).

Wolfenbarger said that back and knee pain limited her ability to work because she had difficulty sitting and standing for long periods. (R. 35, 45). She also had difficulty walking, lifting, bending, and getting down on her knees. (R. 38, 45). Wolfenbarger estimated that she could sit or stand for 30 minutes, and she could lift 35 to 40 pounds. (R. 45). She could walk an eighth of a mile. (R. 45-46). Her knee and back pain required her to lie down during the day in an attempt to relieve the pain. (R. 49-50). The use of a knee brace helped her walk. (R. 40, 50). She had to sit in a recliner to elevate her knee. (R. 50). She had been informed that she had loose cartilage in her knee and had the option of either a knee replacement or hydrocortisone shots. (R. 38-39). Wolfenbarger said that she was unable to afford either option. *Id*.

Wolfenbarger testified that she had been diagnosed with panic disorder and anxiety disorder. (R. 37, 40). She suffered panic attacks that occurred anytime throughout the day. (R. 36-37, 43-44). Her panic attacks occurred while driving and at night. (R. 43). She testified to occasions when she awakened in the night clutching at her throat, feeling that she was unable to breathe and would die. *Id.* Generally her panic attacks lasted approximately twenty to forty minutes. *Id.* She tried to walk around until symptoms passed. *Id.* Depressive symptoms, such as crying spells and difficulty concentrating, accompanied her symptoms of anxiety. (R. 40, 44).

Wolfenbarger had been prescribed Xanax for panic and anxiety symptoms, but she had to discontinue its use because it caused her seizures. (R. 36-38). Her treating physician switched her anxiety medication to Klonopin. (R. 37). Wolfenbarger stated that she had aged 10 years due to her seizures. (R. 44-45). She believed that the seizures had caused her to experience

2

numbness in her legs and hands and to have problems with her vision and teeth. *Id.*

Wolfenbarger had brief attempts to work in 2006 for a temporary job placement service. (R. 34). During a temporary job assignment she experienced symptoms of nausea and vomiting that sent her to an emergency room where she was diagnosed with hepatitis C.[1] (R. 41). Hepatitis C caused Wolfenbarger nausea, fatigue, and liver pain that radiated to her back and stomach. (R. 41- 42). Wolfenbarger testified that she was always tired, but was unable to sleep due to pain and continuous tossing and turning. (R. 41-43, 48). She said that she woke up moaning, groaning, or crying due to liver pain. (R. 43). Wolfenbarger testified that she was in need of a biopsy. (R. 42, 51).

Wolfenbarger testified that after she awakened each day and completed her personal hygiene tasks, she would need to take a break. (R. 47). She was able to cook quick meals, load a small number of dishes in the dishwasher, and straighten the pillows. (R. 47-48). She found the chore of sweeping difficult, and she was unable to vacuum. *Id*. She had previously enjoyed swimming, but she was no longer able to do this. (R. 48). She had no social activities, but she maintained daily contact with her mother. (R. 49). Approximately 5 times weekly she drove to her doctor, to the grocery store, or to her mother's home two blocks away. (R. 47, 49).

William W. Belk, M.D., of Sacred Heart Medical Group in Pensacola, Florida, evaluated Wolfenbarger on January 7, 2004 for complaints of headaches, back pain, and muscle spasms she experienced subsequent to a motor vehicle accident. (R. 168). On examination, Dr. Belk found that Wolfenbarger had paraspinous muscle spasms and tenderness over the thoracic vertebra. *Id.*

---

[1]Hepatitis is defined as inflammation of the liver. Hepatitis C is spread by blood and serum-derived fluids. Taber's Cyclopedic Medical Dictionary 885-86 (17th ed. 1993).

X-rays of her lumbar spine were negative. *Id.* He prescribed medication for pain, muscle spasms, and inflammation. *Id.*

Wolfenbarger presented for medication refill during a January 27, 2005 appointment with Dr. Belk. (R. 169-71). On examination Dr. Belk diagnosed Wolfenbarger with hypertension, low back pain, and ankle sprain. (R. 169-71). Dr. Belk prescribed Xanax and Maxzide for her blood pressure, and refilled pain medication. (R. 170).

On May 5, 2005, Wolfenbarger was examined by Dr. Belk for right arm pain. (R. 172). His exam showed she had lateral elbow tenderness. *Id.* Dr. Belk refilled her pain medication. *Id.*

Records dated July 21, 2005 from Providence Hospital in Mobile, Alabama, reflect Wolfenbarger was brought to the emergency room after she suffered two seizures. (R. 206-23). Wolfenbarger was additionally examined for complaints of back pain. (R. 206). Examining records reflect Wolfenbarger's presenting mood was anxious. (R. 209). Wolfenbarger's cranial CT scan showed no abnormality and showed no change when compared to a June 27, 2003 CT study. (R. 215). Records reflect Wolfenbarger's seizures were the result of Xanax withdrawal. (R. 209).

On November 16, 2005 Wolfenbarger again presented to the emergency room of Providence Hospital following two more seizures caused by Xanax withdrawal. (R. 190-205). Results of a cranial CT scan showed no abnormality and showed no change from the June 27, 2003 scan. (R. 205).

Wolfenbarger presented to Dr. Belk on December 5, 2005 for medication refill. (R. 173). Dr. Belk assessed Wolfenbarger with anxiety and hypertension. *Id.* Dr. Belk noted that

Wolfenbarger needed to take her Maxzide medication as previously prescribed. *Id.* He provided her a refill prescription for Xanax. *Id.*

Wolfenbarger presented to Providence Hospital on January 20, 2006 for an arm injury sustained from a fall. (R. 175-189). Wolfenbarger reported use of Xanax. (R. 180). X-rays showed no abnormality. (R. 187). On January 24, 2006, Wolfenbarger was evaluated at University of South Alabama Medical Center for continued arm pain. (R. 224- 228). X-rays of her forearm, wrist, and elbow were negative. (R. 226). She was provided a sling and instructed to ice and elevate her arm. (R. 228).

Wolfenbarger was brought to the Emergency Room of Tulsa's Saint Francis Hospital on July 6, 2006 following a seizure and foot injury. (R. 243-70). Hospital admitting records show she suffered hypocalemia,[2] alcohol dependency, and benzodiazepine dependency. (R. 264, 270). Wolfenbarger had a high alcohol level and tested positive for opiates. (R. 247, 249, 251, 253, 270). On initial examination, doctors assessed that she had probable alcoholic hepatitis. (R. 247, 270). Wolfenbarger reported she had a fifteen-year history of Xanax use and had stopped taking the medication three days earlier. (R. 246). She reported she had tried to stop taking Xanax on several occasions but suffered seizures on each occasion. (R. 248). Results from cranial CT scan, foot, and chest scans found no significant radiographic abnormality. (R. 261-63). Wolfenbarger tested positive for hepatitis C antibody. (R. 249, 257). Her discharge diagnoses were acute Xanax and alcohol withdrawal, seizures secondary to Xanax and alcohol withdrawal,

---

[2] Hypocalemia is abnormally low blood calcium. Taber's Cyclopedic Medical Dictionary 944. (17th ed. 1993).

and mild rhabdomyolysis.[3] (R. 245).

During Wolfenbarger's hospitalization at Saint Francis, Peter A. Rao, M.D., conducted a limited psychiatric examination consultation for Xanax and alcohol dependency on July 7, 2006. (R. 248-50). Wolfenbarger's mother informed Dr. Rao that Wolfenbarger used Xanax for symptoms related to a long history of panic attacks and anxiety attacks. (R. 248). Wolfenbarger reported recent alcohol use. (R. 249). Dr. Rao noted that Wolfenbarger demonstrated poor memory concentration, slurred speech and depressed mood. *Id.* Wolfenbarger reported a history of depressive moods, accompanied by decreased sleep, interest, and appetite. *Id.* On Axis I[4] Dr. Rao's impressions were alcohol withdrawal, alcohol dependency, anxiolytic withdrawal, anxiolytic dependency, mood disorder not otherwise specified, and anxiety disorder not otherwise specified. (R. 348). He deferred a diagnosis on Axis II. *Id.* He assessed Wolfenbarger's global assessment of functioning ("GAF")[5] as 40-45. *Id.*

On her discharge from Saint Francis on July 10, 2006, Wolfenbarger voluntarily agreed to

---

[3] Rhabdomyolysis is defined as an acute, sometimes fatal disease characterized by destruction of skeletal muscle. Rarely, this may occur following strenuous exercise and in association with use of drugs that can cause coma, such as alcohol, heroin, or cocaine. Taber's Cyclopedic Medical Dictionary 1717 (17th ed. 1993).

[4] The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereafter "DSM-IV").

[5] The GAF score represents Axis V of the multiaxial assessment system. DSM-IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id*. at 32. The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id*. at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id*. A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id*.

6

be admitted to Laureate Hospital under Dr. Rao's care for inpatient rehabilitation for Xanax and alcohol. (R. 250).

Diana DeFelice, D.O., of Morton Health Center ("Morton") evaluated Wolfenbarger for seizures and anxiety on July 21, 2006. (R. 296-301). Wolfenbarger additionally complained of shakiness and dizziness. (R. 296). Wolfenbarger reported that her symptoms of anxiety included chest pain, shortness of breath, and tremors and that she was using Ativan for her anxiety. *Id*. Dr. DeFelice observed that Wolfenbarger had a depressed and anxious affect. (R. 297). Dr. DeFelice prescribed medications for Wolfenbarger's symptoms and noted that Wolfenbarger needed a referral for counseling. *Id.*

At Wolfenbarger's August 3, 2006 appointment with Michael Montague, PA-C, of Morton, she reported that she had experienced improvement of her hand tremors, but the symptoms had restarted approximately four days before the appointment. (R. 294-95). She additionally reported symptoms of anxiety, depression, and shortness of breath. (R. 294). Mr. Montague reported that Wolfenbarger denied alcohol and non-prescription drug use. *Id.* On examination, Mr. Montague found that Wolfenbarger's tongue was swollen and had an ulceration from biting. *Id.* Mr. Montague prescribed medications and noted referrals to a neurologist and a psychiatrist. (R. 295). Lab work completed at the time of this appointment showed that Wolfenbarger's phenytoin[6] level was 2.3, with 10 to 20 mcg/ml being the reference range. (R. 302). On August 9, 2006, Wolfenbarger was seen at Morton to review her lab results. (R. 293).

---

[6]Phenytoin is an anticonvulsant drug. Taber's Cyclopedic Medical Dictionary 1493 (17th ed. 1993).

Wolfenbarger was seen by Mr. Montague on October 5, 2006, and she needed refill of medications for knee pain, anxiety, and hypertension. (R. 291-92). Wolfenbarger additionally requested assistance with a motor vehicle form. (R. 291). Mr. Montague's noted that Wolfenbarger reported she had stopped taking her seizure medication. *Id.* He recommended Wolfenbarger take Dilantin and remain seizure free for a period of six months prior to driving. (R. 292).

Results from an abdominal ultrasound, abdominal CT, and pelvis CT of May 12-14, 2007 showed that Wolfenbarger had a right adrenal nodule that had no clinical significance, and no other significant abnormality. (R. 341-42). A liver doppler test conducted on May 14, 2007 found no portal vein thrombosis, with slight undulation of flow of the portal and splenic vein. (R. 343). Drug screen results were positive for benzodiazepines, cannabinoids, and opiates. (R. 344-45).

On August 6, 2007, Wolfenbarger was referred to Jeffrey L. Bigler, M.D., for evaluation for hepatitis C. (R. 324-32). Wolfenbarger listed her medications as Ativan, methadone, and Phenergan. (R. 325). On examination, Dr. Bigler noted that Wolfenbarger's abdomen was soft, nontender, and nondistended, with normal bowel sounds. (R. 326). Dr. Bigler assessed that she had chronic hepatitis C, low viral load, genotype undetermined. (R. 326). He noted that Wolfenbarger had no clinical appearance of cirrhosis. *Id.* Additional impressions of Dr. Bigler were history of alcohol dependence and withdrawal; history of anxiolytic dependence and withdrawal; and history of depression and anxiety disorder. (R. 327). Dr. Bigler made a recommendation that Wolfenbarger undergo a liver biopsy. (R. 327, 338-339). Saint Francis records show that Wolfenbarger was scheduled for a biopsy on September 14, 2007 and March

14, 2008. (R. 335, 338).

On May 24, 2006, agency consultant Lucile T. Williams, Psy.D., conducted a consultive psychological evaluation of Wolfenbarger. (R. 230-32). Wolfenbarger informed Dr. Williams that she was unable to work because of seizures; pain in her back, knee, and hip; rotten teeth that made her sick; and panic attacks. (R. 230). She said that bipolar disorder kept her from working, although she had never been diagnosed with the disorder. *Id*. Wolfenbarger felt she was bipolar because she cried when watching a television show, and then she would stop and be okay the next moment. *Id*. She reported a history of panic attacks and of an up and down cycle of depression. *Id.* Wolfenbarger told Dr. Williams she did well when she took medication. *Id.* Dr. Williams' notes reflect that Wolfenbarger stated she felt "terrible"because she was having to gradually taper herself off Xanax due to seizures. (R. 230). Wolfenbarger listed her activities of daily living ("ADLs") as taking care of her guinea pig, calling her daughter, and performing household chores when she could. (R. 232). Dr. Williams observed that Wolfenbarger appeared anxious and mildly depressed, and she had a sad affect. (R. 231). Dr. Williams opined that Wolfenbarger's sad affect was appropriate to the content of thought and their conversation. *Id.* Dr. Williams' diagnostic impressions on Axis I were panic disorder without agoraphobia; depressive disorder not otherwise specified; and opioid dependence. (R. 232). Dr. Williams stated that it was likely that within six to twelve months Wolfenbarger would have a favorable response to treatment including psychotherapy. *Id.*

Agency consultant, Travis Rutland, M.D., conducted a consultative examination of Wolfenbarger on June 10, 2006. (R. 234-37). Dr. Rutland recorded that Wolfenbarger's chief complaints were chronic low back pain and bilateral knee pain. (R. 234). Wolfenbarger gave her

medical history and described her ADLs. (R. 234-35). Dr. Rutland noted that Wolfenbarger used Xanax and that she expressed "significant concern" that her primary care doctor had recently discharged her from his care, and she only had three pills remaining. *Id*. Dr. Rutland observed that Wolfenbarger had a normal gait and had no problem getting on and off the examination table. (R. 236). Wolfenbarger had marked crepitus with full range of motion in her knees bilaterally, and she demonstrated pain with active motion. *Id.* Dr. Rutland's diagnoses were chronic low back pain; osteoarthritis of Wolfenbarger's knees with chronic pain; history of panic disorder; and decreased visual acuity. (R. 237).

Agency consultant and ophthalmologist Daniel M. Rencher, III, M.D., conducted an examination of Wolfenbarger on June 29, 2006. (R. 238-40). Wolfenbarger reported that numbness of her right low eyelid and check were the result of a physical assault. (R. 240). On examination, Wolfenbarger's visual acuity with best correction was 20/25-1 on right and 20/20-1 on her left eye. (R. 239). She had normal muscle function, useful binocular vision in all directions for distance and near vision, and normal eye pressure readings. (R. 239-40).

X-rays of Wolfenbarger's right knee taken in connection with her disability claim on July 5, 2006 showed no significant abnormality. (R. 241-42).

On July 13, 2006, nonexamining agency consultant Donald E. Hinton, Ph.D., completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment form. (R. 271-88). On the Psychiatric Review Technique form, Dr. Hinton noted for Listing 12.04 that Wolfenbarger suffered an affective disorder. (R. 274). For Listing 12.06, he assessed an anxiety-related disorder as evidenced by panic disorder. (R. 276). For Listing 12.09, Dr. Hinton said that Wolfenbarger had behavioral changes due to opioid substance addiction. (R.

10

279). For the "Paragraph B Criteria,"[7] Dr. Hinton found that Wolfenbarger had mild restriction of her ADLs, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation. (R. 281). In the "Consultant's Notes" portion of the form, Dr. Hinton noted that Wolfenbarger was scared when driving. (R. 283). Regarding Wolfenbarger's ADLs, Dr. Hinton noted that she was able to take care of most of her personal needs, shop, do laundry, and watch one hour of television. *Id.*

On the Mental Residual Functional Capacity Assessment form, Dr. Hinton noted a moderate limitation of Wolfenbarger's ability to understand, remember, and carry out detailed instructions. (R. 285). He also found a moderate limitation of her ability to maintain attention and concentration for extended periods and of her ability to respond appropriately to changes in the work setting. (R. 285-86). He found no other significant limitations. *Id.* Dr. Hinton elaborated on his findings for the sections involving understanding, memory, and concentration that Wolfenbarger had the ability to understand, remember, and carry out very short and simple instructions. (R. 287). He additionally stated that "[h]e [sic] can attend for two hour periods." *Id*. For social interaction functions, Dr. Hinton found that Wolfenbarger "was not significantly limited." *Id*. Regarding Wolfenbarger's adaptation capacities, Dr. Hinton said that "changes in work setting should be minimal." *Id.*

---

[7]There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

On December 20, 2006 nonexamining agency consultant Janice B. Smith, Ph.D., completed a second set of the Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment form. (R. 303-19). For Listing 12.04, Dr. Smith noted that Wolfenbarger had depression not otherwise specified. (R. 306). For Listing 12.06, Dr. Smith found that Wolfenbarger had panic attacks without agoraphobia. (R. 308). For Listing 12.09, Dr. Smith noted that Wolfenbarger had behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system. (R. 311). For the Paragraph B Criteria, Dr. Smith found that Wolfenbarger had mild restriction in her ADLs, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation. (R. 313).

In the "Consultant's Notes" section of the form, Dr. Smith stated that Wolfenbarger had no formal mental health treatment and had been prescribed Xanax by her treating physicians. (R. 315). *Id*. She noted Wolfenbarger's hospitalizations in 2005 and 2006 were for Xanax withdrawal and alcohol withdrawal. *Id*. She stated that Wolfenbarger's statements that she suffered "extreme depression" and "extreme anxiety" were not supported by medical records or any other evidence. *Id*. Dr. Smith said that Wolfenbarger's ADLs were minimal, but concluded that Wolfenbarger was functional on a daily basis. *Id.* She found that Wolfenbarger had "fair to good" cognitive and intellectual function, and her memory, concentration and attention span appeared to be intact. *Id.*

On the Mental Residual Functional Capacity Assessment form, Dr. Smith found that Wolfenbarger had a moderate limitation in her ability to understand, remember, and carry out detailed instructions and in her ability to interact appropriately with the general public. (R. 317-

18). She found no other significant limitations. *Id*. Dr. Smith elaborated that Wolfenbarger could "understand, remember, and carry out non-complex, as well as moderately detailed, work instructions. She can be expected to interact appropriately with coworkers and supervisors in routine work settings, but may have difficulty with the general public. She can be expected to adapt to most routine workplace changes." (R. 319).

## Procedural History

On February 22, 2006, Wolfenbarger filed an application seeking supplemental security income benefits under Title XVI, 42 U.S.C. §§ 401 *et seq*. (R. 93-95). The application was denied initially and upon reconsideration. (R. 57-61, 64-66). A hearing before ALJ Lantz McClain was held February 4, 2008 in Tulsa, Oklahoma. (R. 30-54). By decision dated April 15, 2008, the ALJ found that Wolfenbarger was not disabled. (R. 9-20). On April 27, 2010, the Appeals Council denied review of the ALJ's findings. (R. 1-5). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. § 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability

claim. 20 C.F.R. § 404.1520.[8] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner.

---

[8]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

*Hamlin,* 365 F.3d at 1214 (quotation omitted).

## Decision of the Administrative Law Judge

At Step One, the ALJ found that Wolfenbarger had not engaged in any substantial gainful activity since her application date of February 22, 2006. (R. 11). At Step Two, the ALJ found that Wolfenbarger had severe impairments of degenerative disc disease with low back pain, osteoarthritis of her knees, obesity, depression, anxiety, and substance abuse. *Id.* At Step Three, the ALJ found that Wolfenbarger's impairments did not meet a Listing. (R. 14).

The ALJ determined that, considering all of Wolfenbarger's impairments, including her substance use disorders, she had the RFC to perform sedentary work, but that she was "significantly compromised" by her inability to do sustained mental work-related activities in a work setting on a regular and continuing basis. (R. 15). At Step Four, the ALJ found that Wolfenbarger had no past relevant work. *Id.* At Step Five, the ALJ found that based on all of Wolfenbarger's impairments, including the substance use disorders, there were no jobs that Wolfenbarger could perform. *Id.*

The ALJ then considered the consequences if Wolfenbarger stopped substance use, and he first concluded that Wolfenbarger's other impairments of degenerative disc disease with low back pain, osteoarthritis of her knees, obesity, depression, and anxiety would remain severe at Step Two. (R. 16). At Step Three, Wolfenbarger's impairments would again not meet a Listing. *Id.* Her RFC would be sedentary work with a limitation to "simple, repetitive tasks with no more than incidental contact with the public." (R. 17). At Step Four, Wolfenbarger again had no past relevant work. (R. 19). At Step Five, the ALJ found that there were a significant number of jobs in the national economy that a person with Wolfenbarger's age, education, work experience, and

RFC, if she stopped substance use, could perform. *Id.* Because Wolfenbarger would not be disabled if she stopped substance use, the ALJ found that her substance use disorders were a contributing factor material to the determination of disability. *Id.* Therefore, the ALJ determined that Wolfenbarger was not disabled at any time from her date of application filing through the date of his decision. (R. 19-20).

**Review**

Wolfenbarger raises only one issue on appeal, arguing that the ALJ's finding that her substance abuse was material to the determination of disability was erroneous and was not based on substantial evidence. The undersigned disagrees with Wolfenbarger's contention and concludes that the ALJ's finding regarding her substance abuse was supported by substantial evidence and complied with the legal requirements. The Court therefore affirms the decision of the Commissioner.

When there is an issue of a disability claimant's substance abuse, the Commissioner follows a specific procedure in deciding whether that substance abuse is a "contributing factor material to the determination of disability." 20 C.F.R. § 416.935. *See also Salazar v. Barnhart*, 468 F.3d 615, 623 (10th Cir. 2006). The first step of this procedure is a finding that the claimant is disabled, but there is also evidence of drug addiction or alcoholism. *Id.* The ALJ then has to decide if the drug addiction or alcoholism is a contributing factor material to the determination, which is determined by whether the ALJ would still find the claimant disabled if the claimant stopped using drugs or alcohol. *Id.* If the limitations that remain if the claimant stopped using drugs or alcohol would not be disabling, then the drug addiction or alcoholism is a contributing factor. *Id.* If the limitations that remain if the claimant stopped using drugs or alcohol would still

16

be disabling, then the claimant is disabled independent of the drug addiction or alcoholism. *Id.*

Here, the ALJ closely followed the required procedure. He first went through all five steps, including Wolfenbarger's substance use, and concluded that she was disabled if the substance use was included because there were not jobs that Wolfenbarger could do considering all of the relevant factors, including his RFC determination that she was unable to do sustained mental work-related activities in a work setting on a regular and continuing basis. (R. 11-15). At that point, the ALJ began his required analysis of what impairments would remain if Wolfenbarger stopped the substance use, and he found that all of her other impairments would remain, including her depression and anxiety. (R. 16). In then formulating Wolfenbarger's RFC with these impairments, but excluding her substance use, the ALJ determined that she could perform sedentary work limited to simple, repetitive tasks with no more than incidental contact with the public. (R. 17).

In his discussion explaining this second RFC determination, excluding Wolfenbarger's substance use, the ALJ first explained that her seizures appeared to be directly related to her extensive use of Xanax for more than 15 years and her sudden discontinuance of it without medical supervision. (R. 18). Once Wolfenbarger had discontinued her use of Xanax, the seizures stopped. *Id.* The ALJ then explained why he found that Wolfenbarger's claims of disabling pain were not persuasive, and Wolfenbarger has not challenged the ALJ's analyses of her pain or credibility. The ALJ then explained why he found that an RFC that limited Wolfenbarger to simple repetitive tasks with no more than incidental contact with the public addressed Wolfenbarger's diagnoses of depression and anxiety. (R. 18-19). The ALJ cited to one of the consultative reports in which Wolfenbarger reported that she had never had psychiatric

treatment other than two emergency room visits for panic attacks. *Id.* He also cited to the reports of nonexamining consultants Dr. Hinton and Dr. Smith in support of his RFC determination. *Id.* Using this second RFC determination, the ALJ determined that, considering all of the relevant factors there were a significant number of jobs in the national economy that Wolfenbarger could perform. (R. 19). He then completed the required procedure, concluding that Wolfenbarger would not be disabled if she stopped her substance abuse and that therefore her substance use was a contributing factor material to the determination of disability. *Id.* Therefore, the ALJ found that Wolfenbarger was not disabled. (R. 19-20).

Wolfenbarger asserts that the ALJ did not "consider any of the substantial medical evidence regarding [her] continuing problems with depression and anxiety in the absence of evidence of substance abuse or during her periods of sobriety." Plaintiff's Opening Brief, Dkt. #16, p. 7. The evidence Wolfenbarger cites in support of this argument is the July 2006 appointment with Dr. DeFelice and the August and October 2006 appointments with Mr. Montague at Morton. Id.; (R. 291-92, 294-97). It is true that the ALJ did not specifically cite to these medical records or discuss them. However, the evidence of these visits is simply evidence that Wolfenbarger continued to experience depression and anxiety, and the ALJ's conclusions are in accord with this evidence. He specifically found that, even if she discontinued her substance use, Wolfenbarger would still have depression and anxiety that were severe impairments.

The ALJ also took into account Wolfenbarger's continuing depression and anxiety in determining her RFC if she discontinued substance use. He accommodated these impairments by limiting Wolfenbarger to simple, repetitive tasks with no more than incidental contact with the public. (R. 17). Nothing in the records of the three office visits cited by Wolfenbarger indicates

18

that she had more severe functional restrictions due to her depression and anxiety, and therefore the evidence cited by Wolfenbarger is not in conflict with the ALJ's determination of her RFC in the absence of her substance use. Furthermore, the ALJ cited to substantial evidence in support of this second RFC determination by citing the opinion evidence of Dr. Hinton and Dr. Smith. *Cowan v. Astrue*, 552 F.3d 1182, 1189-90 (10th Cir. 2008) (opinion evidence of nonexamining consultants can constitute substantial evidence); *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007) (ALJ entitled to consider nonexamining physician's opinion); *Weaver v. Astrue*, 353 Fed. Appx. 151, 154-55 (10th Cir. 2009) (unpublished) (nonexamining opinion was substantial evidence supporting RFC determination). Because the ALJ's decision was based on substantial evidence, and it complied with legal standards, the decision is affirmed.

## Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied. The decision is **AFFIRMED.**

Dated this 14th day of July, 2011.

_____
Paul J. Cleary
United States Magistrate Judge